Thomas **LOCE** and Ed **Richter** both individually and doing business as Life Without Shame, Plaintiffs–Appellants–Cross–Appellees,

v.

**TIME WARNER ENTERTAINMENT ADVANCE/NEWHOUSE PARTNERSHIP d/b/a Time Warner Communications and Time Warner Entertainment–Advance/Newhouse d/b/a Time Warner Cable, Defendants–Appellees–Cross–Appellants.**

Docket Nos. 97–9301, 97–9601 and 98–7040.

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1998.

Decided June 14, 1999.

Edward L. Fiandach, Rochester, New York (Arthur Eisenberg, Kenneth P. Norwick, Fiandach & Fiandach, Rochester, New York, on the brief), for Plaintiffs-Appellants-Cross-Appellees.

Stuart W. Gold, New York, New York (Jeffrey L. Nagel, Cravath, Swaine & Moore, New York, New York, Paul J. Yesawich, III, Harris, Beach & Wilcox, Rochester, New York, on the brief), for Defendants-Appellees-Cross-Appellants.

Before: KEARSE and POOLER, Circuit Judges, and POLLACK, District Judge *.

KEARSE, Circuit Judge:

Plaintiffs Thomas Loce and Ed Richter, individually and doing business as Life Without Shame, appeal from so much of a final judgment of the United States District Court for the Western District of New York, Michael A. Telesca, *Judge,* as dismissed their claims under the First Amendment of the Constitution and § 612 of the Communications Act of 1934, as amended by the Cable Communications Policy Act of 1984 (the "1984 Act"), by the Cable Television Consumer Protection and Competition Act of 1992 ("Cable Act of 1992" or "1992 Act"), and by Title V of the Telecommunications Act of 1996 (collectively the "Cable Act" or "Act"), *codified at* 47 U.S.C. § 532 (1994 & Supp. II 1996), against defendants Time Warner Entertainment Advance/Newhouse Partnership *et al.* (collectively "Time Warner" or "TW") for (a) refusing to transmit certain of plaintiffs' television programs on defendants' leased access channels on the ground that the programs violated defendants' policy against indecent programming, and (b) refusing to specify what parts of the submitted programs defendants found objectionable. The district court granted partial summary judgment dismissing plaintiffs' First Amendment claims on the ground that Time Warner is not a state actor and dismissing in part their statutory claims on the ground that Time Warner's refusals to transmit or assist in editing the programs in question were not unreasonable and hence did not

---

violate the Cable Act. Plaintiffs challenge these rulings on appeal. The district court also ruled that Time Warner's policies of (a) requiring programmers to certify that they would not submit programs that Time Warner would consider indecent, and (b) suspending programmers who had submitted programs that Time Warner considered indecent, and refusing to allow further program submissions by such programmers, violated the Act. Time Warner cross-appeals from so much of the judgment as granted declaratory and injunctive relief against its policy of suspending programmers. For the reasons that follow, we affirm the judgment.

## I. BACKGROUND

Most of the facts are undisputed. Pursuant to franchise agreements with municipalities in and around Rochester, New York, and Syracuse, New York, Time Warner offers cable television service in the Rochester and Syracuse areas. Time Warner offers its subscribers, for a monthly fee, "standard-tier" programming containing several dozen channels, as well as optional "premium" channels for which a subscriber pays an additional monthly fee, and "pay-per-view" programs, for each of which a subscriber must make a specific request and pay a one-time fee. The vast majority of Time Warner's customers in the Rochester and Syracuse areas subscribe only to standard-tier programming.

Standard-tier programming includes "leased access" channels for commercial use by unaffiliated programmers, as required by the 1984 Act, see 47 U.S.C. § 532(b) (1994). Standard-tier programming is unscrambled at all times, and a subscriber cannot avoid receiving the leased access channels except by obtaining an addressable converter capable of blocking specific channels or by having Time Warner install a physical device called a "trap" on the subscriber's cable line. Programs containing nudity and sexually explicit content, when provided by Time Warner or its affiliates, are not shown on standard-tier channels but are confined to the optional premium or pay-per-view channels. The present case involves the contents of programs provided by independent programmers on leased access channels, which, as part of standard-tier programming, are transmitted to all subscribers and are not scrambled.

Loce and Richter are independent producers of cable television programming doing business as Life Without Shame (collectively "plaintiffs" or "LWS"). During the period 1993–1996, pursuant to lease agreements with Time Warner, plaintiffs' television program "Life Without Shame" was broadcast on leased access channels in the Rochester and Syracuse areas. Airing from midnight to 1 a.m., the program principally featured scenes of female nude dancers in various adult clubs in those areas, along with commentary and interviews by Loce and Richter as the show's hosts. The hosts' commentary typically focused on a stripper's physique and the hosts' fantasies about that woman or any number of other women. The program became a source of controversy, as area subscribers and community members petitioned Time Warner to cease carrying the show.

### A. Time Warner's Indecency Policy

In 1996, following the Supreme Court's decision in *Denver Area Educational Telecommunications Consortium, Inc. v. FCC,* 518 U.S. 727, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996), upholding the constitutionality of a provision of the Cable Act of 1992, 47 U.S.C. § 532(h) (1994), which allows cable operators to exercise limited editorial control over programs on leased access channels, see Part II.A, below, Time Warner adopted a written policy forbidding "indecent" material on leased access channels (the "Indecency Policy" or "Policy") in its Rochester and Syracuse divisions ("TW Rochester" and "TW Syracuse" respectively). The Indecency Policy stated, *inter alia,* that Time Warner

has adopted a policy that prohibits indecent programming on leased access channels and which will continue to prohibit obscene programming in accordance with State law. . . .

1. Indecent programming will not be carried on leased access channels.

2. For purposes of this policy, "indecent programming" is defined as any programming that the cable operator reasonably believes describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards for the cable medium. "Obscene" is defined as that term is used in New York Penal Law Section 235. The term "programming" includes advertising.

The Indecency Policy required any program provider seeking use of leased access channel capacity to "certify in its application (a) that the program provider is responsible for the content of the programming; and (b) that the program provider will not submit for cablecast any programming that is obscene or indecent as defined herein." (Indecency Policy ¶ 4.) Time Warner "reserve[d] the right to determine whether programming exhibited or sought to be exhibited is indecent." (*Id.* ¶ 8.)

The Indecency Policy provided that programmers who submitted indecent or obscene material for cablecast could lose their eligibility to obtain or retain leased access channel capacity on the Time Warner system. The first submission of such material was to result in a six-month suspension of the programmer's eligibility; any further submission of such material was to result in a permanent suspension of the programmer's eligibility:

Any program provider who, on more than one occasion, seeks to have indecent material exhibited after having certified that its programming does not contain indecent or obscene material no longer will be eligible to obtain or retain leased access channel capacity on the system. The first time a program pro-

vider who has completed the aforementioned certification submits material that is indecent as defined in this policy, the material will not be cablecast and the program provider's eligibility to obtain or retain leased access channel capacity will be suspended for 6 months. Any submission of obscene material by a program provider constitutes grounds for revocation of all eligibility to obtain or retain leased access channel capacity on the system.

(*Id.* ¶ 7 (the "suspension provisions").)

In early 1997, Loce and Richter entered into new lease agreements with TW Syracuse and TW Rochester for use of leased access channels. Their 1997 lease agreements explicitly incorporated by reference Time Warner's Indecency Policy, and Loce and Richter signed separate documents certifying that LWS would not submit for cablecast any "indecent" or "obscene" material as defined by the Policy.

### B. *The Rejected LWS Programs*

In 1997, LWS submitted to Time Warner three episodes of "Life Without Shame," whose rejection by Time Warner prompted the present lawsuit. In January 1997, LWS submitted to TW Syracuse an episode entitled "The Best of Lookers." The program was filmed at a Syracuse adult club called "Lookers" and contained, *inter alia,* scenes of women dancing topless, fondling their breasts, pressing their breasts against customers' faces, or simulating acts of sex and masturbation. The episode also contained advertisements for various other nude and topless dance clubs in Syracuse, as well as advertisements for an "escort service" promising "we make house and hotel calls." One or more of the commercials showed women topless, contained lines such as "Bring your hard dicks down here," and depicted a topless woman performing a "lap dance" on Richter.

Several officials of TW Syracuse, including the division's president, reviewed "The Best of Lookers" and concluded that the

program was indecent within the meaning of Time Warner's Indecency Policy. TW Syracuse notified plaintiffs that the episode violated the Policy and would not be transmitted. The letter also stated that, pursuant to the suspension provisions, plaintiffs would be prohibited from submitting new material to TW Syracuse for six months.

In February 1997, plaintiffs, no longer able to submit programs to TW Syracuse, submitted to TW Rochester a program entitled "A Tribute to Violence." The program contained numerous real-life scenes of violence and brutality, such as a man being devoured by lions, with his family watching helplessly, and a man committing suicide by shooting himself in the mouth. The episode also contained excerpts from graphically violent motion pictures, such as a Kung Fu scene in which a man with no arms fights a man with no legs, and a scene from a film called "The Gore Gore Girls" in which a man approaches a woman from behind, slits her throat, bends her torso over a table, and beats her buttocks with a meat tenderizer until they are covered with blood. Neither the "A Tribute to Violence" episode nor its accompanying advertisements showed women topless; on the tape, Richter and Loce, seeking to emphasize to their intended audience that Time Warner aired shows depicting carnage and violence but refused to show naked breasts, announced that their purpose was to present a show that was deeply offensive but that did not violate the Indecency Policy because it was free of sexual content.

Despite the latter characterization, the "A Tribute to Violence" tape contained advertisements for adult clubs depicting scantily-clad women and for an escort service; and some of the program content was accompanied by remarks by Loce and Richter having obviously lewd or sexual overtones. For example, the scene depicting the fight between amputees was accompanied by the following exchange between the narrators:

LOCE: We always know you have a thing for amputees.

RICHTER: Oh, amputees are the best. Until you've gone with an amputee, you haven't gone.

LOCE: And you have gone quite far. Right?

RICHTER: With some good women. You know, like I said on a previous show, you know, you don't have to hold the legs back.

And in the scene from "The Gore Gore Girls," the woman whose throat is cut is clad in a partially see-through bikini; her bloodied buttocks are shown; and as she is bent over a table, Loce and Richter, in their narrative, agree that that is their "favorite position of a woman."

After reviewing "A Tribute to Violence," Time Warner refused to transmit the episode. It informed plaintiffs that it considered the program "offensive to contemporary community standards" and that it was exercising "its right under Title 47 USC § 532 and other applicable law to reject the submitted taped program." (Time Warner Letter to LWS dated February 28, 1997.) In rejecting "A Tribute to Violence," Time Warner did not suspend LWS from submitting other programs to TW Rochester.

Throughout February 1997, LWS submitted other shows to TW Rochester that were not deemed indecent under the Indecency Policy. In March 1997, however, LWS submitted to TW Rochester a program entitled "The All Black Special." In that program, Loce and Richter, as the show's hosts, announced that they were paying tribute to the African–American members of their audience. The episode showed scenes of African–American women dancing topless at various adult clubs, fondling their breasts, crawling and gyrating on the floor, and spreading their legs in front of customers. The tape also contained advertisements similar to those in "The Best of Lookers."

At least three officials at TW Rochester, including the division's president, reviewed the "All Black Special" and concurred that the program was indecent. Time Warner notified LWS that the show violated the Indecency Policy and would therefore not be telecast. Time Warner also informed LWS that, pursuant to the Policy's suspension provisions, LWS was prohibited from submitting programs to TW Rochester for six months. Thereafter, "Life Without Shame" was transmitted, without commercial sponsorship, on TW Rochester's public access channel.

## C. *The Present Action*

Following notification of Time Warner's refusal to telecast "The All Black Special," plaintiffs commenced the present action, principally seeking a judgment declaring that the application of Time Warner's Indecency Policy to the three rejected episodes violated plaintiffs' rights under the First Amendment and the Cable Act, and requesting preliminary and permanent injunctions forbidding Time Warner from engaging in pre-screening and censorship pursuant to the Policy. Pointing to the Cable Act's requirement that the terms of leased access use not be "unreasonable," 47 U.S.C. § 532(d) (1994), plaintiffs contended that Time Warner had violated that provision by failing to respond to requests for clarification of whether the Policy forbade depictions of topless women and by refusing to specify the parts of the rejected tapes it considered indecent in order to give programmers an opportunity to edit and resubmit modified versions of the tapes. With regard to "A Tribute to Violence," plaintiffs contended that the Act did not authorize Time Warner to ban programming other than that which violated its written Indecency Policy, and that the show did not violate the Policy because it contained no sexual content. Plaintiffs sought a preliminary injunction requiring Time Warner to transmit "The Best of Lookers," "The All Black Special," and "A Tribute to Violence" in their entirety.

Plaintiffs also argued that if cable operators deem programming to be indecent, the Cable Act authorizes them to bar only the program, not the persons who provide the programs, and they requested an injunction against Time Warner's enforcement of its suspensions of LWS and a judgment declaring that the suspension provisions of the TW Indecency Policy violated the Act.

Time Warner opposed the requests for declaratory and injunctive relief and moved for judgment on the pleadings or for summary judgment dismissing the complaint. It contended that the First Amendment was not applicable because, *inter alia,* Time Warner is not a state actor. It contended that the Cable Act permitted it to refuse to air the three programs because they were "patently offensive" as judged by contemporary community standards in the Rochester and Syracuse areas. With regard to "A Tribute to Violence," Time Warner argued that the concept of indecency was broad enough to encompass graphic violence, and that a number of the scenes on the tape contained sexual content. With regard to the "The Best of Lookers" and "The All Black Special," the contents of those programs were described by Time Warner as follows in its statement of material facts as to which it contended there was no genuine issue to be tried:

4. Plaintiffs' show "Life Without Shame" has in the past included programming consisting of the following: (a) repeated nudity, including topless female dancers, (b) simulated acts of sex, (c) simulated acts of masturbation, (d) repeated use of language such as "fuck", "shit", "ass", "tits", and "dick", (e) repeated advertisements for strip clubs, "escort" services and "1–800" phone-sex hotlines, (f) advertisements for stores selling sexual devices, (g) repeated close-up camera shots of both clothed and unclothed breasts and buttocks, (h) full frontal nudity, and (i) the use of double-en-

tendre highly suggestive of sexual acts.

. . . . .

6. The tapes the "Best of Lookers" and "The All Black Special" each contain programming of the kind detailed in (4) above.

(Time Warner Statement of Material Facts pursuant to Rule 56 of the Local Rules for the Western District of New York ("Rule 56 Statement") ¶¶ 4 and 6.) Although plaintiffs, in opposition to defendants' summary judgment motion, argued that the segments in question, and the language used in them, were not indecent within the meaning of 47 U.S.C. § 532(h) (1994) or the Time Warner Indecency Policy, they did not dispute the factual assertions in ¶¶ 4 and 6 of Time Warner's Rule 56 Statement.

Time Warner also submitted affidavits stating that since "Life Without Shame" began airing, TW Syracuse and TW Rochester had received several objections to the show's content from local religious and political leaders. Those divisions had also received hundreds of letters and telephone calls from cable subscribers objecting to the show, as well as requests from more than 1500 subscribers in the Syracuse area and 800 in Rochester for traps to block the transmission of the pertinent leased access channels.

As to plaintiffs' contention that Time Warner should permit resubmission of edited tapes, Time Warner submitted affidavits stating that the cost would be excessive. It stated that the cost of pre-screening submitted programs was more than twice the amount of the fee charged by Time Warner for use of the leased access channels, and it contended that the Act did not require it to identify for programmers each part of a program that was obscene or patently offensive under community standards. Asserting that the 1992 Act was intended to accord cable operators significant flexibility in administering leased access channels,

Time Warner argued that the 1992 Act neither required it to review edited versions of programming already deemed indecent nor prevented it from suspending programmers who submitted indecent material. TW also pointed out that Loce and Richter, in their 1997 lease agreements, had certified that they would comply with the Indecency Policy.

In a comprehensive Decision and Order dated September 11, 1997 ("Decision"), the district court granted summary judgment dismissing most of plaintiffs' claims, but upheld their challenge to the suspension provisions. It dismissed the First Amendment claims on the ground that Time Warner was not a state actor because its contested action had not been "compelled by the State." Decision at 18. It dismissed plaintiffs' statutory challenges to Time Warner's rejections of "The Best of Lookers" and "The All Black Special" pursuant to its Indecency Policy, reasoning that the 1992 Act requires reviewing courts to accord a "presumption of reasonableness" to the decisions of cable operators, Decision at 31, that determinations of "indecency" are essentially factual in nature, and that Time Warner's indecency determinations were not unreasonable given that the tapes contained "a number of examples of activities that could be said to fall within the definition of the term 'indecent programming' including simulated acts of sex and masturbation," *id.* at 33.

The court held that Time Warner's refusal to telecast "A Tribute to Violence" was likewise a reasonable exercise of Time Warner's general authority under the 1992 Act to refuse to transmit programming that is "filthy" or "indecent":

"A Tribute to Violence" contains an incessant barrage of horrifying scenes depicting real-life violence. Not only do most of the scenes contain disturbing images of violence, but many of the scenes also depict degrading acts such as a woman being beaten with a meat tenderizer, or paraplegics being forced to combat one another for sport. A

cable operator applying just about any community standard could easily find this compilation "foul," "putrid," and "offensive to manners or morals." Given the nature of this episode, I find that Time Warner was justified in refusing to broadcast it over its leased access channels.

Decision at 35 (quoting Webster's Ninth New Collegiate Dictionary).

The district court also rejected plaintiffs' contentions that Time Warner's procedures with respect to its consideration of proffered programs were unreasonable. The court held that Time Warner had no obligation to "serve as assistant editors" in order to allow programmers to edit and resubmit rejected programs, concluding that Time Warner's

> policy prohibiting editing and resubmission is not *per se* unreasonable. The Cable Act of 1992 gave cable companies the *right to censor* leased access programs, *not the obligation to serve as assistant editors* to program providers. Nor does the Act require cable companies to work with program providers to ensure that material submitted to the company is decent. Instead, cable companies may simply refuse to transmit indecent material. Given the broad discretion and deference afforded cable companies under the Cable Act, I find Time Warner's policy to be reasonable.

Decision at 30 (emphasis added).

However, the court upheld plaintiffs' claims that the Indecency Policy's provision for suspensions of program suppliers, not just for the rejection of programming, violated the Cable Act. The district court stated that

> [t]he purpose of the Cable Act of 1992 was to ban programs, not programmers.... The six-month and life-time bans however, punish program providers in a manner not contemplated by the statute by cutting off access to the leased access channels. No support for such a sanction is found in either the statute or the regulations. Banning the

program is the ultimate sanction contemplated by the Act.

Decision at 26. The court rejected Time Warner's argument that the suspension provisions were necessary for inexpensive enforcement of the Indecency Policy. The court reasoned that the ultimate sanction of keeping a program off the air was sufficiently "effective in that it denies program providers the opportunity to present their programs and maintain commercial support, and also allows the cable company to keep indecent material off of its leased access channels." *Id.* It stated that any expense of reviewing program content was "part of the price for the privilege to regulate the leased access [channels]." *Id.* at 27. Accordingly, the court declared so much of the Indecency Policy as called for the suspension of program providers, rather than the rejection of submitted programs, void as violative of the Cable Act.

The district court also found flawed the Indecency Policy requirement that programmers certify that they would "not submit for cablecast any programming that is obscene or indecent as defined herein" (Indecency Policy ¶ 4), given that the Policy defined "indecent programming" in terms of what "*the cable operator reasonably believes* describes or depicts" patently offensive material (Indecency Policy ¶ 2 (emphasis added)). The court found this certification requirement unreasonable because it required a programmer to guess how Time Warner would feel about his program and exposed him to a penalty for simply guessing wrong. The court noted, however, that if the phrase "cable operator reasonably believes" were deleted, the certification provision would be valid. Time Warner has not challenged the court's ruling on the certification provision and has informed us that it has since modified the Policy by deleting the offending phrase.

The district court dismissed all of plaintiffs' other claims. The final judgment "permanently enjoin[s defendants] from

enforcing the suspension provisions of its written policy prohibiting broadcast of indecent material." (Judgment dated December 12, 1997.) These appeals followed.

## II. DISCUSSION

On their appeal, plaintiffs challenge so much of the district court's judgment as dismissed their claims under the First Amendment and their claims asserting that Time Warner violated the Cable Act by rejecting the three programs in question and by not facilitating resubmission of the programs after modification. Time Warner, on its cross-appeal, challenges so much of the judgment as declares the suspension provisions unlawful and enjoins their application. For the reasons that follow, we reject both sides' challenges.

### A. *The Statutory Provisions Governing Leased Access Channels*

Under 47 U.S.C. § 532(b) (1994), which was part of the 1984 Act, a cable operator is required to allocate a certain percentage of its system's capacity for leased access channels, *i.e.,* channels for commercial use by programmers not affiliated with the cable operator. Congress's stated purpose in requiring leased access channels was "to assure that the widest possible diversity of information sources are [*sic*] made available to the public from cable systems in a manner consistent with growth and development of cable systems." 47 U.S.C. § 532(a) (1994). Programmers using leased access channels may include commercial advertising in their programs and must pay a fee to the cable operator for use of the channel. Cable operators may also be required, by the franchising authority, to reserve a certain amount of channel capacity for "public, educational, or governmental use." *Id.* § 531(a). Public access channels are available at low or no cost to members of the public, and programs on those channels generally do not include commercial advertising.

The 1984 Act included two provisions with regard to editorial control over pro-grams cablecast on leased access channels. It provided that "[a] cable operator shall not exercise any editorial control over any video programming [on leased access channels], or in any other way consider the content of such programming," 47 U.S.C. § 532(c)(2) (1994); and it provided that "the franchising authority" could prohibit or impose conditions on the transmission of material that "in the judgment of the franchising authority is obscene, or is in conflict with community standards in that it is lewd, lascivious, filthy, or indecent or is otherwise unprotected by the Constitution of the United States," 47 U.S.C. § 532(h) (1988).

In section 10(a) of the Cable Act of 1992, Congress amended § 532(h) to give cable operators limited authority to control editorial content of programs transmitted on leased access channels. *See* 1992 Act, Pub.L. No. 102–385, § 10(a), 106 Stat. 1460, 1486. As thus amended, § 532(h) provides as follows:

> Any cable service offered pursuant to this section shall not be provided, or shall be provided subject to conditions, if such cable service in the judgment of the franchising authority or the cable operator is obscene, or is in conflict with community standards in that it is lewd, lascivious, filthy, or indecent or is otherwise unprotected by the Constitution of the United States. This subsection shall permit a cable operator to enforce prospectively a written and published policy of prohibiting programming that the cable operator reasonably believes describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards.

47 U.S.C. § 532(h) (1994). Consistent with this 1992–amended version of § 532(h), Congress in 1996 amended § 532(c)(2) (which theretofore had forbidden cable operators to exercise any editorial control over or to consider the content of programming on leased access channels), by

adding the exception that "a cable operator may refuse to transmit any leased access program or portion of a leased access program which contains obscenity, indecency, or nudity," 47 U.S.C. § 532(c)(2) (Supp. II 1996).

In 1996, in *Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 116 S.Ct. 2374, 135 L.Ed.2d 888 (*"Denver Area"*), the Supreme Court rejected a facial challenge to the constitutionality of the 1992–amended version of § 532(h) that granted limited editorial control to cable operators. *See* 518 U.S. at 737–53, 116 S.Ct. 2374 (plurality opinion of Breyer, J.); *id.* at 819–26, 116 S.Ct. 2374 (Thomas, J., concurring in the judgment in part and dissenting in part). It was in the wake of the *Denver Area* decision that Time Warner adopted its Indecency Policy pursuant to § 532(h).

B. *Plaintiffs' Claims Under the First Amendment*

 The First Amendment applies only to state actors. In order to establish a First Amendment claim against a private entity based on the entity's relationship to the state, a plaintiff must demonstrate, *inter alia,* "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Such a nexus may be found, for example, where a private actor has operated as a "willful participant in joint activity with the State or its agents." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 941, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (internal quotation marks omitted). In the absence of such a nexus, a finding of state action may not be premised on the private entity's creation, funding, licensing, or regulation by the government. *See, e.g., San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 543–44, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (Olympic Com-

mittee not a state actor merely because it was chartered by Congress); *Rendell–Baker v. Kohn,* 457 U.S. 830, 840–43, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (special private school not state actor merely because of substantial funding and regulation by state). Nor is a private entity a state actor merely because its conduct is authorized by a state law, where its conduct is not compelled by the state. *See, e.g., Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 164–66, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (no state action where private storage company threatened to sell plaintiff's stored goods, as authorized by state law, to cover unpaid storage fees); *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 350–51, 95 S.Ct. 449 (electricity provider operating pursuant to state-granted monopoly not a state actor).

Section 532(h) does not compel cable operators to exercise editorial control over leased-access-channel program content. Notwithstanding the language of the first sentence of subsection (h), stating that if the franchising authority or the cable operator judges the program to be obscene or in conflict with community standards, a leased-access-channel program "shall not" be transmitted or "shall" be transmitted only subject to conditions, 47 U.S.C. § 532(h) (1994), the second sentence of that subsection indicates that, with respect to cable operators, the subsection is permissive. That second sentence says "[t]his subsection shall *permit* a cable operator to enforce prospectively a written and published policy" of banning programs it reasonably believes to contain obscene or patently offensive matter as measured by contemporary community standards. *Id.* (emphasis added). Accordingly, in upholding § 532(h), the *Denver Area* Court described that subsection as merely permitting, not requiring, the cable operator to ban programs as to which it held such a reasonable belief. *See, e.g.,* 518 U.S. at 733, 745–46, 116 S.Ct. 2374 (plurality opinion of Breyer, J.); *id.* at 768, 771, 116 S.Ct. 2374 (Stevens, J., concurring); *id.* at 779, 116 S.Ct. 2374 (O'Connor, J., concur-

ring in part and dissenting in part); *id.* at 783, 797, 116 S.Ct. 2374 (Kennedy J., concurring in part and dissenting in part). *See also Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 8 F.C.C.R. 998, 1003 (1993). The interpretation of § 532(h) as permissive is also supported by clear legislative history. Senator Helms, author of the amendment containing the language that would eventually be added to § 532(h), stated that "[t]he pending amendment merely gives cable operators the legal right to make that decision. The amendment does not require cable operators to do anything." 138 Cong. Rec. 985 (1992).

In the present case, the district court correctly ruled that there was no basis on which to infer that Time Warner's Indecency Policy or its treatment of LWS constituted state action. The fact that federal law requires a cable operator to maintain leased access channels and the fact that the cable franchise is granted by a local government are insufficient, either singly or in combination, to characterize the cable operator's conduct of its business as state action. Nor does it suffice that cable operators, in their management of leased access channels, are subject to statutory and regulatory limitations.

Plaintiffs argue that Time Warner is a state actor because cable operators and local franchising authorities act as joint venturers in the administration of leased access channels. But that conclusory assertion is not supported. The record offers no evidence that Time Warner and the municipal franchising authorities jointly administer leased access channels. Nor is there any suggestion that the franchise agreements reserve to the franchising municipalities control over Time Warner's editorial decisions. As indicated above, Time Warner itself is permitted by 47 U.S.C. § 532(h) (1994) and 47 U.S.C. § 532(c)(2) (Supp. II 1996) to refuse to transmit leased access programming that, in its judgment, is obscene, or is in conflict with community

standards in that it is lewd, lascivious, filthy, or indecent. Time Warner presented evidence as to its formulation and implementation of the Indecency Policy; there is no indication in the record of any assistance from or supervision by municipal, state, or federal authorities, and plaintiffs presented no evidence of any governmental participation. Similarly, there is no evidence that Time Warner's determinations that the three shows in question were indecent were made with any input or influence from a government. Although Time Warner received complaints from civic leaders, there is no indication in the record that it received any order, instruction, or request for editorial control from the franchising municipalities or any other government.

In sum, plaintiffs presented no evidence from which a rational factfinder could infer joint action between Time Warner and any government with respect to the content of leased-access-channel programming. We conclude that the district court properly dismissed plaintiffs' First Amendment claims.

C. *Plaintiffs' Claims Under the Cable Act*

The Cable Act provides that "[a]ny person aggrieved by the failure or refusal of a cable operator to make channel capacity available for use pursuant to" § 532 may bring an action in federal court "to compel that such capacity be made available." 47 U.S.C. § 532(d) (1994). In such an action, the court may order appropriate relief if it "finds that the channel capacity sought by such person has not been made available in accordance with [§ 532], or finds that the price, terms, or conditions established by the cable operator are unreasonable." *Id.* The Act also provides that in such an action, "there shall be a presumption that the price, terms, and conditions for use of [leased access] channel capacity ... are reasonable and in good faith unless shown by clear and convincing evidence to the contrary." *Id.* § 532(f) (1994).

Plaintiffs contend that the district court erred in ruling that Time Warner's refusals to transmit the three episodes in question were permissible under the Cable Act. They argue principally that "The Best of Lookers" and "The All Black Special" could not properly be rejected because they do not contain depictions of oral sex, bestiality, or rape, and because the shows would have been telecast late at night with minimal risk that children would be watching; and they argue that "A Tribute to Violence" could not properly be rejected because it included no sexual or excretory depictions or descriptions. They also contend that Time Warner's refusal to identify for LWS the objectionable portions of the submitted programs, to facilitate editing and resubmission, was unreasonable. We disagree.

### 1. *Reasonableness of Rejection*

As detailed in Part II.A. above, by 1997, when plaintiffs submitted the episodes in question to Time Warner, the Cable Act allowed a cable operator to refuse to transmit on a leased access channel any program that "contains obscenity, indecency, or nudity," 47 U.S.C. § 532(c)(2) (Supp. II 1996); it allowed the operator to deny leased-channel access or to provide access "subject to conditions" if the proffered program "in the judgment of . . . the cable operator is obscene, or is in conflict with community standards in that it is lewd, lascivious, filthy, or indecent or is otherwise unprotected by the Constitution of the United States," *id.* § 532(h) (1994); and it allowed the operator to "enforce prospectively a written and published policy of prohibiting programming that the cable operator reasonably believes describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards," *id.*

In amending § 532(h) in 1992, Congress sought to address, *inter alia,* "sexually explicit programs" such as "depict[ions of] men and women stripping completely

nude," "explicit sex ads," "incest, beastiality [*sic* ], even rape," "oral sex," and "strip shows," 138 Cong. Rec. 985, 986 (1992) (statement of Sen. Helms, author of the amendment); "porn shows with ads for phone lines that promised to let listeners eavesdrop on acts of incest," and "sex shows and X-rated previews of hard-core homosexual films," *id.* at 987 (statement of Sen. Thurmond, a principal cosponsor of the amendment); and "hard core pornography," *id.* at 988 (statement of Sen. Coats, a principal cosponsor of the amendment). The Act was intended to reach more than simply obscene programming, as defined by the Supreme Court in obscenity cases, *see, e.g., Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (material that "portray[s] sexual conduct in a patently offensive way," and that "taken as a whole, appeal[s] to the prurient interest in sex," and that "taken as a whole, do[es] not have serious literary, artistic, political, or scientific value"), for the language of § 532(h) reaches material that "would be offensive enough to fall within that category" despite the fact that it has serious value or has nonprurient purposes, *Denver Area,* 518 U.S. at 751–52, 116 S.Ct. 2374 (plurality opinion of Breyer, J.). The legislative history reveals that the language of § 532(h) was patterned after the definition of "indecent" material, as first adopted by the Federal Communications Commission ("FCC") and judicially approved in the broadcast context. That agency characterized as "indecent" language that is not necessarily prurient but that describes "sexual or excretory activities and organs" in terms that are "patently offensive as measured by contemporary community standards." *Pacifica Foundation,* 56 F.C.C.2d 94, 98 (1975) ("*Pacifica I* "); *see also Regulations Concerning Indecent Communications by Telephone,* 5 F.C.C.R. 4926, 4927 (1990) (same definition in context of commercial telephone messages). The FCC's view of indecency as extending beyond obscenity was upheld by the Supreme Court in *FCC v. Pacifica Foundation,* 438 U.S. 726, 740, 98 S.Ct.

3026, 57 L.Ed.2d 1073 (1978) (*"Pacifica II"*) ("[p]rurient appeal is an element of the obscene, but the normal definition of 'indecent' merely refers to nonconformance with accepted standards of morality"). And in describing the proposed (and eventually adopted) 1992 amendment to § 532(h), its author stated that the proposed language was "exactly the same as the FCC definition [of indecency] which was upheld by the Supreme Court." 138 Cong. Rec. 985 (1992) (statement of Sen. Helms).

■ The FCC has noted that the Cable Act confers on cable operators "wide discretion to determine the manner in which they may enforce a policy of prohibiting indecent leased access programming." *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 8 F.C.C.R. at 1002–03. Thus, although material that is patently offensive may be less so if shown in late-night hours when children are less likely to see it, *see, e.g., Denver Area*, 518 U.S. at 752, 116 S.Ct. 2374 (plurality opinion of Breyer, J.); *Pacifica II*, 438 U.S. at 750, 98 S.Ct. 3026, section 532(h) permits cable operators not only to confine indecent material to late-night programming but also permits them to prohibit such material entirely, *see Denver Area*, 518 U.S. at 746, 116 S.Ct. 2374 (plurality opinion of Breyer, J.).

■ Whether offensive material can be prohibited under § 532(h) depends, in large part, on its context. *See Denver Area*, 518 U.S. at 752, 116 S.Ct. 2374 (plurality opinion of Breyer, J.); *see also Pacifica II*, 438 U.S. at 750, 98 S.Ct. 3026; *Infinity Broadcasting Corp.*, 2 F.C.C.R. 2705, 2705 (1987) (*"Infinity I"*) ("what is indecent 'is largely a function of context' and cannot adequately be judged in the abstract"). In addition, the FCC has noted that while the indecency concept does not justify a ban of an entire program because of "the isolated use of an offensive word," *Infinity I* 2 F.C.C.R. at 2705, neither need there be a constant stream of sexual or excretory depictions before a program may be banned, *see Pacifica Foundation, Inc.*, 2 F.C.C.R. 2698, 2699 (1987) (*"Pacifica III"*). That agency has declined to "attempt to provide [broadcasters] with a comprehensive index or thesaurus of indecent words or pictorial depictions that will be considered patently offensive," *Infinity Broadcasting Corp.*, 3 F.C.C.R. 930, 931–32 (1987) (*"Infinity II"*), and it has noted that the assertion that sexually-oriented programming involves merely innuendo or double entendre does not mean that it falls outside the category of the patently offensive and indecent. *See Infinity I*, 2 F.C.C.R. at 2705–06.

■ Within this framework, the district court properly concluded that there was no genuine issue of fact to be tried as to the reasonableness of Time Warner's rejection of the three LWS episodes in question. "The Best of Lookers" and "The All Black Special" included the scenes described in Part I.B. above, and plaintiffs did not dispute Time Warner's Rule 56 Statement assertion that those episodes contained such features as repeated nudity, including close-up camera shots of unclothed breasts and buttocks; simulated acts of sex and masturbation; advertisements for strip clubs, "escort" services, "1–800" telephone-sex hotlines, and stores selling sexual devices; and double-entendre highly suggestive of sexual acts, as well as repeated use of language such as "tits," "ass," "dick," and "shit." On this record, no rational factfinder could find that Time Warner's belief that "The Best of Lookers" and "The All Black Special" depicted sexual activities or organs in a patently offensive manner as measured by contemporary community standards was not reasonable.

■ Nor are we persuaded by plaintiffs' argument that Time Warner's rejection of "A Tribute to Violence" was not reasonable because that episode concerned only violence and not sex, for plaintiffs' factual premise is belied by the tape itself. In addition to being laced with advertise-

ments for strip clubs and an "escort" service, the episode is replete with blatantly sexual innuendo. For example, in narrating one scene, Loce and Richter refer to a "'Pedophile' organization." In the scene from "The Gore Gore Girls," the woman shown being savaged is wearing a partially see-through bikini; Loce repeatedly refers to her "ass"; and when the beaten woman lies bent over a table, Richter states, and Loce agrees, "that's my favorite position of a woman." Similarly, in the scene depicting the fight between amputees, Loce and Richter discuss Richter's penchant for amputees; and Richter states his view that "amputees are the best" and that "[u]ntil you've gone with an amputee, you haven't gone," and his rationale that with a woman "you don't have to hold the legs back."

Plaintiffs did not adduce any evidence from which a rational factfinder could find that Time Warner's rejection of "A Tribute to Violence" on the ground of indecency was not reasonable. No rational factfinder could fail to see the sexual connotations in "A Tribute to Violence," and neither the fact that its sexual content is less constant than in "The Best of Lookers" and "The All Black Special," nor the fact that it consists largely of double-entendres and innuendo rather the sexually oriented or scatological words used in "The Best of Lookers" and "The All Black Special," sufficed to undermine Time Warner's view of "A Tribute to Violence" as patently offensive under the prevailing community standards or to make rejection of the episode unreasonable.

We conclude that the district court properly ruled that plaintiffs were not entitled to either declaratory or injunctive relief requiring Time Warner to transmit the three episodes in question.

### 2. *The Reasonableness of Time Warner's Procedures*

■■ Plaintiffs also contend that the district court erred in rejecting their claims that Time Warner's procedures are unreasonable because Time Warner does not identify for programmers what parts of the submission it deems obscene or indecent in order to allow the programmer to edit and resubmit the program. The district court rejected this claim on the ground that the Cable Act imposes no obligation on a cable operator to work with a programmer in the program editing process. We agree substantially for the reasons stated in the district court's Decision.

We note, in passing, however, that we do not regard the district court as having given Time Warner carte blanche to refuse even to consider programming that has been rejected, has thereafter been substantially edited to remove the obscene or patently offensive material, and is then resubmitted. The question of whether such a refusal would be permissible was not squarely presented. The Time Warner Indecency Policy, though containing (the now invalidated) provisions for the suspension of programmers who had submitted programs that Time Warner rejected pursuant to the Policy, did not state that a once-rejected program could not be edited to remove the offending material and then resubmitted. Nor did plaintiffs make any effort to resubmit any of the three rejected episodes. (Plaintiffs advised the district court that if the portions of "The Best of Lookers" and "The All Black Special" depicting topless women were removed, there would be little left.) And although the district court referred to the Time Warner Indecency Policy as not allowing resubmissions, the court's rationale for dismissing this claim was simply that the Cable Act gives cable companies "the right to censor leased access programs, not the obligation to serve as assistant editors to program providers" or the obligation "to work with program providers to ensure that material submitted to the company is decent." Decision at 30.

### D. *The Suspension Provisions*

■■ In its cross appeal, Time Warner contends that the district court erred in construing the Cable Act as not authoriz-

ing cable operators to suspend persons who have submitted indecent programming. TW argues that that interpretation of § 532 unduly restricts its flexibility in enforcing the Indecency Policy and that a practice of tape-by-tape review would be unduly expensive. We reject these contentions substantially for the reasons stated in the district court's Decision.

As discussed in the preceding sections, the editorial control given to cable operators under §§ 532(c)(2) and 532(h) is limited. As this Court has noted with respect to the public access counterpart to § 532(c)(2), *i.e.*, 47 U.S.C. § 531(e) (Supp. II 1996), a "refusal to broadcast *all* of [a programmer's] future programming," far from exercising limited control, would constitute "the strongest and broadest possible form of editorial control." *McClellan v. Cablevision of Connecticut, Inc.*, 149 F.3d 161, 168 n. 14 (2d Cir.1998) (emphasis in original). We see no indication that Congress, in fashioning § 532(h) to give a cable operator limited authority to prohibit "programming" described by that section, intended that section or any other to authorize the cable operator to impose a blanket ban on all programs (irrespective of content) of a given program supplier. Indeed, in requiring cable operators to provide leased access channels, Congress sought principally to assure the widest possible diversity of information sources on cable systems. *See* 47 U.S.C. § 532(a) (1994). A cable operator's exclusion of a given supplier would, instead, plainly limit the number of potential program sources. Finally, we see no indication that Congress meant to imply that a cable operator could reasonably believe any given program to be patently offensive solely because of its source. Nor does the present record suggest that Time Warner could be justified in such a belief with respect to LWS. As noted in Part I.B. above, LWS for a period of time submitted shows to TW Rochester that were not deemed indecent under TW's Indecency Policy.

In sum, we reject Time Warner's contention that the Act authorizes it to foreclose the submission of programs based solely on source, without regard to whether they contain material whose prohibition is authorized by §§ 532(c)(2) and (h). As the district court concluded,

> [t]he purpose of the Cable Act of 1992 was to ban programs, not programmers.... The six-month and life-time bans however, punish program providers in a manner not contemplated by the statute by cutting off access to the leased access channels. No support for such a sanction is found in either the statute or the regulations.

Decision at 26.

Finally, although Time Warner argues that a tape-by-tape review process will be unduly expensive, we note that § 532(c)(1) allows a cable operator to "establish, consistent with the purpose of [§ 532]" and with such rules as are prescribed by the FCC, "price, terms and conditions of [leased-access-channel] use which are at least sufficient to assure that such use will not adversely affect the operation, financial condition, or market development of the cable system." 47 U.S.C. § 532(c)(1) (1994). (*See also* Plaintiffs' brief on appeal at 40 (suggesting, as an "appropriate" approach, "a regime of fines or penalties to cover additional costs for a second screening").) In light of § 532 as a whole, we cannot conclude that Congress intended to permit cable operators to exclude program suppliers because of the expense of determining whether their products should be excluded in accordance with §§ 532(c)(2) and (h).

We conclude that the district court properly ruled that the suspension provisions violated the Act. Time Warner remains free in accordance with §§ 532(c)(2) and (h) to reject any program it reasonably believes is obscene or patently offensive as measured by contemporary community standards.

## CONCLUSION

We have considered all of the parties' contentions in support of their respective appeals and have found them to be without merit. The judgment of the district court is affirmed.