252 F.3d 545 (2nd Cir. 2001)
 LYNN GORMAN-BAKOS AND RODNEY BAKOS, PLAINTIFFS-APPELLANTS-CROSS-APPELLEES,
v.
CORNELL COOPERATIVE EXTENSION OF SCHENECTADY COUNTY, ELLEN ELLIOTT, INDIVIDUALLY AND AS EXECUTIVE DIRECTOR OF CORNELL COOPERATIVE EXTENSION OF SCHENECTADY COUNTY, ANGELA WARNER, INDIVIDUALLY AND AS AGENT, SERVANT AND EMPLOYEE OF CORNELL COOPERATIVE EXTENSION OF SCHENECTADY COUNTY, MIKE PIEROTTI, INDIVIDUALLY AND AS PRESIDENT OF CORNELL COOPERATIVE EXTENSION OF SCHENECTADY COUNTY, DOROTHY FOSTER, BOB LINDSAY, TIM MANNING, MARION PIERCE, JO ANN RAFILIK, STEVE RAS, LINDA ROHMER, SHARON SUTTON AND GRACE UNDERWOOD, INDIVIDUALLY AND AS DIRECTORS OF CORNELL COOPERATIVE EXTENSION OF SCHENECTADY COUNTY, DEFENDANTS-APPELLEES-CROSS-APPELLANTS.
 Docket No. 00-9012, 00-9104
Spring Term, 2001
 UNITED STATES COURT OF APPEALS For the Second Circuit
 Argued: March 14, 2001
Decided June 4, 2001
 
 1
 Plaintiffs-Appellants appeal from a judgment of the United States District Court for the Northern District of New York (Frederick J. Scullin, Jr., Chief Judge), granting defendants' motion for summary judgment because plaintiffs failed to offer sufficient proof of a causal connection between their allegedly constitutionally protected speech and their dismissal from defendants' 4-H program. Defendants-Cross-Appellants appeal the denial of their request for attorney's fees.
 
 
 2
 The appeal is granted, and the judgment is vacated and remanded; the cross-appeal is denied as moot.[Copyrighted Material Omitted]
 
 
 3
 L. John Van Norden, Schenectady, New York, for Plaintiffs-Appellants Lynn Gorman-Bakos and Rodney Bakos.
 
 
 4
 Jeffrey T. Culkin, Gordon, Siegel, Mastro, Mullaney, Gordon & Galvin, P.C., Latham, New York, for Defendants-Appellees Cornell Cooperative Extension of Schenectady County, Ellen Elliott, individually and as Executive Director of Cornell Cooperative Extension of Schenectady County, Angela Warner, individually and as agent, servant and employee of Cornell Cooperative Extension of Schenectady County, Mike Pierotti, individually and as President of Cornell Cooperative Extension of Schenectady County, and Dorothy Foster, Bob Lindsay, Tim Manning, Marion Pierce, Jo Ann Rafilik, Steve Ras, Linda Rohmer, Sharon Sutton and Grace Underwood, individually and as directors of Cornell Cooperative Extension of Schenectady County.
 
 
 5
 Before: Sotomayor, Katzmann, Circuit Judges, and Chin, District Judge.*
 
 Katzmann, Circuit Judge
 
 6
 Plaintiffs-Appellants Lynn Gorman-Bakos ("Gorman-Bakos") and Rodney Bakos ("Bakos") (together, the "Bakoses" or "plaintiffs") appeal from a judgment of the United States District Court for the Northern District of New York (Frederick J. Scullin, Chief Judge), awarding summary judgment to defendants because plaintiffs failed to produce sufficient evidence of a causal connection between their speech and defendants' alleged retaliatory employment actions. The Bakoses argue that the district court erred in granting summary judgment because they offered sufficient facts to prove that a causal connection existed between their dismissal and their constitutionally protected speech. Defendants-Cross-Appellants appeal the denial of their request for attorney's fees.
 
 
 7
 For the reasons stated below, we vacate and remand for further proceedings. We dismiss the cross-appeal as moot.
 
 BACKGROUND
 I. The Cooperative
 
 8
 Defendant the Cornell Cooperative Extension Association of Schenectady County (the "Cooperative") is a subordinate government agency composed of an unincorporated organization of citizens of Schenectady County. See N.Y. County L. § 224(8)(b). In association with Cornell University, the Cooperative runs extension programs, including a 4-H program.[1] See N.Y. County L. § 224(8). The Cooperative is supported by federal, state and county funds. See 18 U.S.C. §§ 361a et seq.; N.Y. County L. § 224(8)(a),(b). The Cooperative is governed by a board of directors. See N.Y. County L. § 224(8)(b). At the time of the events alleged in the complaint, defendants Dorothy Foster, Bob Lindsay, Tim Manning, Marion Pierce, Jo Ann Rafilik, Steve Ras, Linda Rohmer, Sharon Sutton and Grace Underwood were members of the Cooperative's Board of Directors; defendant Mike Pierotti ("Pierotti") served as the president of the Board of Directors and of the Cooperative; defendant Ellen Elliott ("Elliott") served as the Executive Director of the Cooperative; and defendant Angela Warner ("Warner") served as the 4-H Youth Development Leader for the Cooperative's 4-H program.
 
 II. Plaintiffs' Initial Concerns
 
 9
 In January 1997, plaintiffs, who are residents of Schenectady County and horse enthusiasts, applied to volunteer with the Cooperative's 4-H program. In February 1997, they enrolled as 4-H volunteer leaders and organized a 4-H club known as the "Horses & Hounds 4-H Club." Based on their participation in the 4-H program, the Bakoses became concerned about the Cooperative, believing that the Cooperative managed and allocated government funds in a manner inconsistent with its policies, had insufficient safety rules governing 4-H-sponsored horse competitions and activities, held inadequate insurance coverage for horse-related activities, and had inadequate guidelines for judging horse competitions.
 
 
 10
 According to defendants, in May 1997, the Bakoses contacted a New York State Horse Program faculty member at Cornell University, Jeanne Griffith ("Griffith"), to discuss the 4-H horse program. Warner learned of this discussion and spoke with Griffith, who told her that the Bakoses were concerned about the Cooperative's lack of cooperation with them. Warner had several conversations with the Bakoses, and in June 1997, the Schenectady 4-H Horse Club held a meeting to discuss its horse programs. The club, including the Bakoses, formed a Horse Rally committee to improve and promote its horse programs. During the summer, the committee met several times and worked closely with Warner. Warner allegedly received numerous complaints about the Bakoses' attitude and conduct during the Horse Rally committee meetings. In September 1997, the Bakoses resigned from the committee.
 
 
 11
 In October 1997, the Bakoses wrote to Warner regarding their worries about the Cooperative's 4-H program. While planning a meeting with the Bakoses, Warner, Elliott and the Bakoses exchanged heated correspondence. On October 22, 1997, Elliott, Warner and a Cooperative educator met with the Bakoses in person, and during the meeting, developed a plan to address the Bakoses's concerns. Nonetheless, the Bakoses were unsatisfied with the Cooperative's response. During November and December, the Bakoses, Warner, Elliott and another staff member engaged in further heated conversations and correspondence. Warner scheduled a meeting with 4-H Horse Club members for late December 1997, but this meeting was postponed when Gorman-Bakos could not attend.
 
 
 12
 In November and December 1997, the Bakoses requested various membership lists and other documents from the Cooperative. At the end of January, Bakos requested a list of all 4-H volunteers. On the advice of Cooperative's FOIL officer and after checking the Cooperative's policy manual, Elliott informed the Bakoses that she could not release the list.
 
 III. Contacts with Local Political Leaders
 
 13
 In December 1997, the Bakoses wrote to Frank Potter ("Potter"), Chairman of the Schenectady County Legislature, and Robert McEvoy ("McEvoy"), the Schenectady County Manager, to criticize the Cooperative's resource allocation and to express concerns about its 4-H program. In early January 1998, Bakos met with Potter and McEvoy. After this meeting, Bakos called Warner and told her that he was concerned with animal science funding, horse programming and the lack of safety guidelines. On January 19, 1998, Gorman-Bakos wrote to Warner and Elliott to reiterate the issues raised by Bakos in his recent conversation with Warner. On January 21, 1998, Elliott, Pierotti and Potter met with the Bakoses, who explained their dissatisfaction with the Cooperative, including its response to safety issues and its initial rejection of an out-of-county youth's membership in the Horse & Hounds. The Cooperative agreed that the out-of-county youth could join the Horse & Hounds and that the Cooperative's staff would draft and circulate horse-related safety guidelines within thirty days.
 
 
 14
 On January 23, 1998, Bakos called Elliott to ask that he be scheduled to address the Cooperative's Board of Directors at its next meeting. The request was granted, and Bakos made a presentation to the Board, discussing horse-safety issues and the Cooperative's lack of interest in large animal issues. On February 2, 1998, Gorman-Bakos called Warner to advise her that plaintiffs wanted to transfer the Horses & Hounds to the 4-H program of a neighboring county. Elliott and Warner informed plaintiffs that the Cooperative did not object to such a move. On February 5, 1998, Bakos wrote to Elliott to alert her that they planned to meet with three Schenectady County legislators to discuss the 4-H club, including its lack of safety rules, and alleged financial mismanagement of the Cooperative. On February 23, 1998, Elliott met with two legislators who had conferred with Bakos, and provided the legislators with information they requested.
 
 IV. Safety Guidelines
 
 15
 On January 26, 1998, the Board of Directors voted to suspend large animal programs until safety guidelines were put in place. Warner led the safety guidelines project, and by mid-February, she circulated draft regulations. In early March 1998, Warner sent a letter to 4-H volunteer leaders advising them that the Board of Directors had suspended large animal programs for youths. On March 23, 1998, the Board of Directors adopted the Animal Safety Guidelines for Adults Working with Youth, and lifted the ban on large animal activities for those leaders who agreed to read and follow the guidelines. On April 3, 1998, Warner wrote to tell the volunteer leaders about the Board's adoption of the guidelines. According to the Bakoses, Pierotti suspended 4-H horse activities at their farm even before they were suspended for other sites. The Bakoses believed that the early suspension had a discriminatory motive.
 
 
 16
 V. Termination of Plaintiffs' 4-H Membership
 
 
 17
 On March 2, 1998, Warner had a telephone conversation with Bakos. Warner claims that Bakos told her that he and Gorman-Bakos were resigning as 4-H members; the Bakoses claim that they never resigned. On March 3, 1998, Elliott and Warner sent plaintiffs a letter confirming their resignation, and wrote to inform the parents of members of the Horse & Hounds Club of the resignation. The next day, plaintiffs mailed Warner a letter denying their alleged resignation. On March 6, 1998, the Bakoses' attorney also sent Elliott a letter denying that his clients had resigned and demanding an immediate retraction. On April 27, 1998, an executive session of the Board of Directors voted to "reaffirm with the Bakos their decision to resign and if they refuse to accept it, to terminate them as volunteers."
 
 
 18
 In describing plaintiffs' participation in 4-H, defendants allege that plaintiffs' conduct disrupted the Cooperative's operation. For example, the Cooperative states that "[t]he content, form and context of plaintiffs' complaints herein clearly show that plaintiffs [sic] comments were motivated by their own personal agenda rather than any regard for the greater public good. Plaintiffs' complaints were made in the context of their efforts to have things done their way." Defendants claim that "[t]he manner in which plaintiffs communicated their concerns was disruptive and undermined the functioning of the organization. Plaintiffs were clearly not seeking to engage in serious debate on matters of public concern; but rather were engaging in repeated outbursts of petulance and boorishness when they did not get their way." Plaintiffs dispute these characterizations of their conduct.
 
 
 19
 On August 19, 1998, plaintiffs filed suit under 42 U.S.C. § 1983, alleging violations of their First, Fifth and Fourteenth Amendment rights, and under the New York State Constitution, alleging violations of their free speech, due process and equal protection rights. The factual basis for these claims was plaintiffs' allegation that the Cooperative retaliated against them by, among other things, terminating their volunteer status and enrollment in 4-H because, in discussions with Cooperative members and staff as well as with local elected officials, plaintiffs advocated policies contrary to those of defendants. After discovery, defendants moved for summary judgment, which was granted on July 13, 2000, because the district court held that plaintiffs had failed to provide sufficient evidence of a causal connection between their exercises of free speech and the allegedly retaliatory actions taken by defendants. The district court declined to exercise supplemental jurisdiction over plaintiffs' state law claims.
 
 DISCUSSION
 
 20
 We review a district court's grant of summary judgment de novo. See Byrnie v. Town of Cromwell, 243 F.3d 93, 101 (2d Cir. 2001). "At summary judgment, a court is tasked with determining whether genuine disputes over material fact exist between the parties which should properly be submitted to a jury or whether, where no issues of material fact are found, the moving party is entitled to judgment as a matter of law." Id. "[W]hen examining the evidence, the court should resolve all ambiguities and draw all inferences in favor of the non-moving party." Id.
 
 I. State Actor
 
 21
 In the present case, the district court assumed that the Cooperative was a state actor. Because the district court provided little or no discussion with regard to this issue, and the parties do not argue it on appeal, we do not reach it. Our own sense of the law suggests that the Cooperative can be treated as a state actor for purposes of the First Amendment merits.[2] In Loce v. Time Warner Entertainment Advance/Newhouse Partnership, 191 F.3d 256, 266 (2d Cir. 1999), this Court explained:
 
 
 22
 The First Amendment applies only to state actors. In order to establish a First Amendment claim against a private entity based on the entity's relationship to the state, a plaintiff must demonstrate, inter alia, a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. Such a nexus may be found, for example, where a private actor has operated as a willful participant in joint activity with the State or its agents. In the absence of such a nexus, a finding of state action may not be premised on the private entity's creation, funding, licensing, or regulation by the government. Nor is a private entity a state actor merely because its conduct is authorized by a state law, where its conduct is not compelled by the state.
 
 
 23
 Id. (internal quotation marks and citations omitted). Recently, the Supreme Court identified a "host of facts" that can bear on whether an activity may be attributable to the state: when the state exercises its coercive power or significant encouragement, when a private actor is a willful participant in joint activity with the state, when an entity is controlled by the state or an agency thereof, when an entity has been delegated a public function by the state, when an actor is entwined with governmental policies, or when the government is entwined in the entity's management or control. See Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 121 S. Ct. 924, 930 (2001). In an earlier case specifically addressing the status of a government-created corporation as a state actor, the Supreme Court held that where "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." Lebron v. National R.R. Passenger Corp., 513 U.S. 374, 400 (1995) (holding that Amtrak was a state actor).
 
 
 24
 The corporate defendant in the present case is the Cooperative. It was originally created and is funded under a federal program providing for cooperative extension programs to operate in conjunction with the United States Department of Agriculture and state land grant universities to disseminate useful information for individuals living in rural areas. See 7 U.S.C. § 341; see also Knight v. Alabama, 14 F.3d 1534, 1546-49 (11th Cir. 1994) (describing cooperative extension programs). In New York, the state's County Law allows counties to create subordinate governmental agencies to provide extension services in conjunction with two Cornell University colleges. See N.Y. County L. § 224(8). Under New York law, a "subordinate governmental agency" is an organization which either through legislative act or contract with the state or subdivision of the state performs governmental functions. See People v. Brooklyn Cooperage Co., 187 N.Y. 142, 156 (1907); see also Stahl Soap Corp v. City of New York, 182 N.Y.S.2d 808, 809 (N.Y. 1959) (New York City is a subordinate government agency); E&J Holding Corp. v. Noto, 510 N.Y.S.2d 899, 901-02 (2d Dep't 1987) (in New York, subordinate governmental agencies include the City of New York, villages and towns). The New York County Law allows a county board of supervisors to pay for the support of an extension service, including staff salaries, and to levy taxes to support the Cooperative. See N.Y. County L. § 224(8)(a). The County Law defines the scope of the extension service's programs, which may extend to "agriculture, home economics, 4-H and community betterment," as well as its organizational structure. Id. § 224(8)(b). Under the Cooperative's by-laws, its form and organization are subject to approval by Cornell University as an agent of the State. The policies and programs of the Cooperative are set by its Board of Directors in conjunction with the Director of Extension programs of Cornell University. Its Board of Directors must include a representative of the Director of Extension programs and a member of the Schenectady County's legislature. The Cooperative entered into a memorandum of understanding with Cornell University, as an agent of the state and as a designated agent of the United States, for Cornell to provide extensive support and oversight for the Cooperative.
 
 
 25
 In sum, the Cooperative was created pursuant to state law to carry out county, state and federal educational functions; is funded by federal, state and county governments; is subject to significant oversight by Cornell University as an agent of the state; and is defined in state law as a subordinate governmental agency. We suggest that these factors, demonstrating that the Cooperative is a creature of the state which voluntarily carries out state functions with state encouragement, indicate that the Cooperative is a state actor for purposes of the First Amendment.[3]
 
 II. Causation
 
 26
 The district court evaluated plaintiffs' claims under the Morris v. Lindau, 196 F.3d 102 (2d Cir. 1999), standard for First Amendment retaliation claims brought by public employees. Under Morris,
 
 
 27
 a plaintiff making a First Amendment retaliation claim under § 1983 must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination. If a plaintiff establishes these three factors, the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct.
 
 
 28
 Morris, 196 F.3d at 110 (internal quotation marks and citation omitted). The district court dismissed plaintiffs' free speech claim because it found that they had failed to establish the third Morris factor, a causal connection.[4] The district court described the events set forth in the record, and then stated:The foregoing sequence of events does not support Plaintiffs' theory that they were terminated at a time soon after county officials began an inquiry into the operations of the Coop Extension. Defendants first learned that Plaintiffs were seeking county involvement more than five months before Plaintiffs were terminated as volunteers. This lapse of time is too great to support an inference of retaliation.
 
 
 29
 The district court rejected plaintiffs' claim that defendants had retaliated because of plaintiffs' ongoing complaints and contacts with county officials. It reasoned that because defendants had produced evidence that they reacted favorably, rather than negatively, to plaintiffs' conduct, the Bakoses had not established the causal link necessary to support a retaliation claim.
 
 
 30
 In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by "showing that the protected activity was closely followed in time by the adverse [employment] action." Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (citation and quotation marks omitted) (twelve days between alleged sexual harassment and discharge could suggest a causal relationship). This court has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.[5] Compare Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446-47 (2d Cir. 1999) (abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (discharge less than two months after plaintiff filed a sexual harassment complaint with management and ten days after filing complaint with state human rights office provided prima facie evidence of a causal connection between protected activity and retaliation); and Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980) (eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship), with Hollander v. American Cyanamid Co., 895 F.2d 80, 85- 86 (2d Cir. 1990) (passage of three months too long to suggest a causal relationship between complaint and failure to provide good recommendation). Other Circuits have come to different conclusions.[6] Compare Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1112 (3d Cir. 1997) (en banc) (suggesting that four or five months between discriminatory acts and firing may suggest relationship, while holding that plaintiff failed to provide sufficient evidence of discriminatory intent), with Filipovic v. K&R Express Sys., Inc., 176 F.3d 390, 398-99 (7th Cir. 1999) (four months was too long to suggest causal relationship between filing charges and termination).
 
 
 31
 In the case at hand, we need not nail down the elusive outer limit. The Bakoses claim that the Cooperative took three retaliatory actions: 1) in January 1998, suspending horse programs at their farm under the proposed safety guidelines when such activities were not suspended at other sites; 2) in March 1998, determining that the Bakoses had communicated their resignation, and advising some 4-H members and their parents of the resignation; and 3) in April 1998, voting to accept the Bakoses's resignation, and, in the alternative, to terminate their membership if they rescinded their resignation.[7]
 
 
 32
 The Bakoses initially publicly complained about the 4-H program in May 1997, with their discussion with Griffith at Cornell. Their protests continued through the summer, and escalated in October 1997, when they wrote to the Cooperative leadership with their concerns. They complained to county leaders in December 1997, and continued these contacts through February1998. Taking these facts in the light most favorable to plaintiffs, only a few days passed between their contact with county leaders and the suspension of 4-H horse activities on their farm. Only two months passed between the January meeting with county leaders and the dispute over the alleged resignation, and only three months went by between the January meeting and the Board of Directors' vote to terminate the Bakoses. In each case, the passage of time was brief enough to support an inference of a causal connection between the free speech and the alleged retaliatory actions. Even if we were to follow the district court's lead and consider the time between the Bakoses's December 1997 contact with McEvoy and Potter, and the termination vote, only about four months elapsed between these events. This temporal proximity is sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion. We are particularly confident that five months is not too long to support such an allegation where plaintiffs have provided evidence of exercises of free speech and subsequent retaliatory actions occurring between December 1997 and April 1998.
 
 
 33
 The district court held that "[i]n light of Defendants' relatively quick [positive] responses, combined with the passage of two months (February-April) where Plaintiffs made no further mention of meeting with county officials, the Court finds no basis upon which to conclude that any causal connection exists between Plaintiffs' expression of their concerns to both Coop Extension and county officials, and their ultimate termination as volunteer leaders." Contrary to the district court's conclusion, defendants' allegedly positive response to plaintiffs' call for changes in the 4-H program does not defeat plaintiffs' opposition to the motion for summary judgment. It is possible, in light of the evidence offered, that defendants recognized that plaintiffs had identified areas in which the 4-H program might improve, yet at the same time sought to expel plaintiffs from participation in the 4-H program because of the challenges with which they presented defendants.
 
 III. Defendants' Explanations
 
 34
 Defendants advance two explanations for why they were entitled to dismiss plaintiffs. First, they argue that they would have terminated plaintiffs' 4-H membership even if the plaintiffs had not engaged in protected speech because plaintiffs' other non-protected conduct interfered with the Cooperative's operation. See Mount Healthy Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 286 (1977); Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) (citation omitted); Heil v. Santoro, 147 F.3d 103, 110 (2d Cir. 1998) (affirming summary judgment for defendants on plaintiff's First Amendment retaliation claim where plaintiff police officer would have been disciplined for insubordination without regard to his protected speech). The Bakoses contend that defendants mischaracterize their actions, and they emphasize the lack of objective evidence to support defendants' claim that their conduct, in contrast to their speech, negatively affected the Cooperative's operation.
 
 
 35
 Second, defendants argue that even assuming that they dismissed plaintiffs, and did so because of their protected speech, they were entitled to do so because the manner in which the speech was expressed was so disruptive of the Cooperative's operation that the Cooperative's interest in continuing to provide its services without excessive interference outweighed plaintiffs' interest in free speech. Plaintiffs counter that their speech did not disrupt the Cooperative's functioning and that defendants responded to the content of their speech, not the allegedly disruptive manner in which the speech was delivered. Plaintiffs further contend that the Cooperative dismissed them, at least in part, because of their communications with county legislators-- communications that, we note, defendants do not claim were disruptive to the Cooperative in any way.
 
 
 36
 In Greenwich Citizens Committee, Inc. v. Counties of Warren & Washington Industrial Development Agency, 77 F.3d 26 (2d Cir. 1996), relied upon by both defendants and the district court, we emphasized that a key inquiry with respect to any claim of First Amendment retaliation is whether the allegedly retaliatory act was taken because of an "impermissible reason." Id. at 32. This determination of impermissibility is generally applicable to all claims. In Greenwich, the determination of the constitutionality of the government's filing of counterclaims in response to plaintiffs' complaint turned solely on whether the government would have filed the counterclaims in the absence of an impermissible punitive or retaliatory reason. Id. at 31. Where the routine conduct of litigation could justify the response, we held the government would be entitled to take action precisely in response to the protected conduct without any need to demonstrate that its interests outweighed plaintiffs' First Amendment interests, unless the government acted in order to retaliate for the filing of the suit.[8] Id. at 33.
 
 
 37
 Of further guidance in the public employment context is the Pickering-Connick test, which provides an analytical framework within which to assess whether the government employer made an adverse employment decision that would not have been made absent protected conduct or retaliatory motive. See Connick v. Myers, 461 U.S. 138, 142 (1983); Pickering v. Board of Ed., 391 U.S. 563, 568 (1968). Under this test, if the factors set forth in Morris are demonstrated in plaintiffs' favor, the defendants may offer evidence that the employee's protected conduct interfered with the employer's "effective and efficient fulfillment of its responsibilities to the public," Frank v. Relin, 1 F.3d 1317, 1329 (2d Cir. 1993) (internal quotation marks omitted), to such an extent that the trial court determines that the interest of the employer in providing effective and efficient public services outweighs the employee's First Amendment right to free expression. Lewis v. Cowen, 165 F.3d 154, 162 (2d Cir.), cert. denied, 528 U.S. 823 (1999). Of course, the plaintiffs may also offer evidence to contest the defendants' evidence.
 
 
 38
 As a general rule, the application of the balancing test is a question of law which is properly performed by the district court. Id. at 164. In the present case, however, the facts relevant to that determination are contested.
 
 
 39
 This Court has not decided how the balancing test should be conducted when the facts underlying the balancing are in dispute. However, in Vasbinder v. Ambach, 926 F.2d 1333, 1340 (2d Cir. 1991), we stated that, although the plaintiffs in that case had "consistently treated the [Pickering] balancing issue here as turning solely on questions of law, not on any question of fact,"
 
 
 40
 [w]e can envision cases in which the question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation would properly be regarded as a question of fact, to be answered by the jury prior to the court's application of the Pickering balancing test.
 
 
 41
 The present case appears to be just the kind of case envisioned by the Vasbinder court. Among other items, the parties disagree as to the manner in which the Bakoses's speech was delivered; whether the Bakoses's speech disrupted, or had the potential to disrupt, the Cooperative's functioning; and whether even if such disruption occurred, plaintiffs were in fact not dismissed because of the disruption, but because of the content of their speech. See Waters v. Churchill, 511 U.S. 661, 681 (1994) (four justices concurring, with three justices concurring in judgment) (remanding First Amendment retaliation claim for further proceedings because even where defendants "would have been justified in firing [plaintiff] for [particular statements], there remain[ed] the question whether [plaintiff] was actually fired because of those statements or because of [other nondisruptive statements]); Sheppard v. Beerman, 94 F.3d 823, 827 (2d Cir. 1996) ("[E]ven if the potential disruption to the office outweighs the value of the speech, the employer may fire the employee only because of the potential disruption, and not because of the speech."). In addition, the parties dispute the extent to which the Bakoses's communications with legislators-which defendants have not claimed were disruptive-were the basis for the Bakoses's dismissal. These underlying factual disputes go to the fundamental issue of the true motivation behind plaintiffs' dismissal. See Frank, 1 F.3d at 1330 (reversing grant of summary judgment for defendants where motivation for firing "clearly involved disputed questions of fact").
 
 
 42
 Plaintiffs and defendants have supported their respective positions with deposition testimony, affidavits and documents; each side has presented a plausible interpretation of the conflicting evidence. Under the rules of summary judgment, because essential factual issues remain unresolved, we are unable to decide as a matter of law whether defendants' interests outweigh plaintiffs' interests. Were we permitted to accept defendants' representations in the most favorable light, we would be inclined to find as a matter of law that plaintiffs' conduct was so disruptive of the Cooperative's operation that defendants' interests outweighed plaintiffs' rights to unrestrained free speech with regard to the Cooperative; however, we may not do so. As this court has repeatedly stated:
 
 
 43
 The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried. Assessments of credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment. Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment.
 
 
 44
 Vital v. Interfaith Med. Ctr., 168 F.3d 615, 622 (2d Cir. 1999) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted)). Both sides' arguments rest heavily on the proper characterization of plaintiffs' speech and defendants' motives. Making these determinations correctly depends on an evaluation of conflicting testimonial evidence, which a factfinder is in the best position to evaluate. It would be improper at this stage for the district court-or this court on appeal-to resolve the factual disputes between the parties, or to decide the proper balance between the parties' interests. Accordingly, after these underlying factual disputes are decided by a factfinder, the district court should consider the factual findings to come to its own legal conclusions about whether the employer's interest in efficiency or the employee's interest in free speech is paramount. See Belk v. City of Eldon, 228 F.3d 872, 878 (8th Cir. 2000), cert. denied, 121 S. Ct. 1734 (2001); Shands v. City of Kennett, 993 F.2d 1337, 1342-43 (8th Cir. 1993); cf. Pouillon v. City of Owosso, 206 F.3d 711, 717 (6th Cir. 2000).
 
 
 45
 Accordingly, the judgment is vacated, and the case remanded for further proceedings.
 
 IV. Attorney's Fees
 
 46
 Because the judgment is vacated, it is premature for the court to evaluate an award of attorney's fees. The defendants' cross-appeal is therefore denied as moot.
 
 
 
 NOTES:
 
 
 *
 The Honorable Denny Chin of the United States District Court for the Southern District of New York, sitting by designation.
 
 
 [1]
 According to the website of the National 4-H Council, the 4-H is one of the largest youth organizations in the United States with more than 6.6 million participants and more than 631,880 youth and adult volunteers working directly and indirectly with youth. Universally recognized by its four-leaf clover emblem, 4-H serves youth through a variety of methods including organized clubs, school-enrichment groups, special interest groups, individual study programs, camps, school-age child care programs and instructional television programs. To date, more than 45 million people are 4-H alumni. National 4-H Council, http://www.fourhcouncil.edu/Market/4hinfo/index.htm (accessed Mar. 21, 2001). The four "H"s stand for head, heart, hands and health. See National 4-H Council, http://www.fourhcouncil.edu/Market/4hinfo/4hfactsheet.htm# The 4-H Emblem and Pledge Explained (accessed Mar. 21, 2001).
 
 
 [2]
 With regard to a related issue, we note that the district court presumed that plaintiffs had suffered an adverse employment action. We do not address the question of whether plaintiffs' claims of termination from volunteer positions based on protected conduct are equivalent to, or should be analyzed differently from, more traditional claims of termination from salaried government positions. See, e.g., Hyland v. Wonder, 972 F.2d 1129, 1135 (9th Cir. 1992) (holding that serving as a volunteer constituted a government benefit or privilege and that "[r]etaliatory actions with less momentous consequences [than loss of employment], such as loss of a volunteer position, are equally egregious in the eyes of the Constitution because a person is being punished for engaging in protected speech").
 
 
 [3]
 The defendants do not argue that they are not subject to the First Amendment.
 
 
 [4]
 As to the first factor, defendants argue that plaintiff's speech was not constitutionally protected because it did not address a matter of public concern. This argument is incorrect. Plaintiffs' claims related to the administration of the Cooperative and the allocation of funds were based on alleged mismanagement of government funds and violations of its by-laws, which are clearly matters of public concern. See Vasbinder v. Scott, 976 F.2d 118, 119-20 (2d Cir. 1992) (complaint of financial mismanagement of government funds was protected speech); see also Keyser v. Sacramento City Unified Sch. Dist., 238 F.3d 1132, 1137 (9th Cir. 2001) (complaint about supervisor's alleged misuse of federal funds was protected speech); Johnson v. Multnomah County, Oregon, 48 F.3d 420, 425 (9th Cir.), cert. denied, 515 U.S. 1161 (1995) ("[W]e have stated that misuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern."). Plaintiffs' other speech focused on the safety of young children at horse shows involving 4- H, a matter of public concern. See Morris, 196 F.3d at 113-14 (report of corruption and safety complaints to OSHA were matters of public concern); Gagliardi v. Village of Pawling, 18 F.3d 188, 189-90, 194-95 (2d Cir. 1994) (complaints about failure to enforce zoning code, including safety provisions, were protected speech). As to the second factor, defendants argued below that they did not terminate plaintiffs at all but that plaintiffs resigned. For the purposes of the summary judgment motion, however, the district court assumed that plaintiffs had, in fact, been terminated. Because, as set forth infra, plaintiffs' claims cannot be disposed of as a matter of law on the ground provided by the district court or any other grounds, this factual dispute may require resolution at trial.
 
 
 [5]
 Neither have the district courts in this circuit drawn a bright line rule. Compare Suggs v. Port Auth. of N.Y. & N.J., 1999 WL 269905, at *6 (S.D.N.Y. May 4, 1999) (six months between filing EEOC complaint and firing suggests causal relationship); Bernhardt v. Interbank of N.Y., 18 F. Supp. 2d 218, 226 (E.D.N.Y. 1998) (eleven months between protected activity and firing might suggest relationship where defendant had possible reasons for delaying firing); Stephens v. State Univ. of N.Y. at Buffalo, 11 F. Supp. 2d 242, 250 (W.D.N.Y.1998) (approximately six months between EEOC complaint and filing of disciplinary report might show causal connection); Shin v. Itochu Int'l, Inc., 1998 WL 474198, at *4 (S.D.N.Y. Aug. 13, 1998) (immediate termination suggests causal relationship between complaint and dismissal); and Henderson v. Center for Cmty. Alternatives, 911 F. Supp. 689, 702 (S.D.N.Y. 1996) (same, six weeks), with Lynk v. Henderson, 2000 WL 178859, at *4 (S.D.N.Y. Feb. 15, 2000) (three years between EEO complaint and reprimand too great to show causal relationship); Lambert v. New York State Office of Mental Health, 2000 WL 574193, at *13 (E.D.N.Y. Apr. 24, 2000) (in light of intervening circumstances, five months was too great a time period to establish retaliation for EEOC complaint); and Castro v. Local 1199, Nat'l Health & Human Servs. Employees Union, 964 F. Supp. 719, 728 (S.D.N.Y. 1997) (one year is too long to show causal connection between filing of EEOC complaint and termination).
 
 
 [6]
 In explaining its decision, the district court relied on Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997), which was cited favorably in Morris, and in which the Tenth Circuit held that a "four-month lag defeats an inference of causation." In Morris, however, the time lag between the protected activity and the retaliation was longer than two years. See Morris, 196 F.3d at 113.
 
 
 [7]
 The Bakoses also suggest that Cooperative staff denied them access to 4-H membership lists in an effort to curtail their ability to speak with 4- H members.
 
 
 [8]
 The court referred to the filing of the complaint as a "unitary event," because the government's response to the same event could be either permissible or impermissible based solely on whether it was done with an intent to punish the plaintiffs. Id. at 33. This differed from a public employment scenario in which-absent a claim of harm to institutional interests--the issue typically is "whether the defendant was motivated to take the adverse state action in retaliation for conduct protected by the Constitution, or because of some other conduct," i.e., which one of two events provided the basis, because "a finding that the defendant acted because of the protected conduct is tantamount to a finding that the defendant acted with retaliatory intent." Id. (emphasis in original).