**Richard F. RUSCOE, Plaintiff,**

v.

**The HOUSING AUTHORITY OF THE CITY OF NEW BRITAIN and Paul Vayer, individually and in his official capacity as Executive Director of the Housing Authority of the City of New Britain, Defendants.**

**No. CIV.3:00CV0757(AHN).**

United States District Court,
D. Connecticut.

March 4, 2003.

Jonathan L. Gould, Hartford, CT, for Plaintiff.

Michael Peter McKeon, Robert J. Murphy, Nicole Alexandra Bernabo, Sara N. Robinson, Sullivan, Schoen, Campane & Connon, Hartford, CT, for Defendants.

## RULING ON SUMMARY JUDGMENT MOTION

NEVAS, District Judge.

Richard F. Ruscoe ("Ruscoe") brings this action against the Housing Authority of the City of New Britain ("Housing Authority") and Paul Vayer ("Vayer"), individually and in his capacity as Executive Director of the Housing Authority ("collectively defendants"). Ruscoe alleges that the Housing Authority violated the Age Discrimination in Employment Act, 29 U.S.C. § 621 ("ADEA"), and the Connecticut Fair Employment Practices Act, Conn. Gen.Stat. § 46a–60(1) ("CFEPA"), and

that defendants violated his rights to free speech and equal protection as guaranteed by the First and Fourteenth Amendments. Defendants have filed a motion for summary judgment on all counts. For the reasons set forth below, the motion is DENIED.

## FACTS

The following facts are undisputed.

### I. *The Parties*

Ruscoe was born on September 9, 1938 and is a resident of Newtown, Connecticut. The Housing Authority is a public body. Vayer is the Executive Director of the Housing Authority and has held that position since August 1997. Prior to Vayer's August 1997, appointment as Executive Director, Victor Cassella ("Cassella") served as the Housing Authority's Acting Executive Director. Before assuming the position of Acting Executive Director, Cassella had been the Housing Authority's Director of Capital Projects where he specialized in contract administration and dealt with the United States Department of Housing and Urban Development ("HUD").

### II. *Relevant History*

While serving as Acting Executive Director, Cassella also continued to perform his duties as Director of Capital Projects, and at some juncture late in 1996, Cassella sought assistance with his workload. Although his former position of Director of Capital Projects remained vacant, Cassella did not seek to hire anyone to fill it because he was uncertain about whether he would reassume the position once the Housing Authority hired a permanent Executive Director. Moreover, the Housing Authority had not authorized the creation of another position. For these reasons, Cassella suggested that the Housing Au-

thority retain an independent contractor to assist him.

On December 16, 1996, Ruscoe sent a letter to Cassella expressing his interest in the independent contractor position. Ruscoe had previously worked for the Greenwich Housing Authority, but his position there had been eliminated approximately three months earlier.

Cassella met with Ruscoe to discuss the position. On January 1, 1997, Ruscoe drafted a proposed agreement that provided in part:

NBHA agrees to retain the services of [Ruscoe] for the purposes of providing assistance and consultation on a month-to-month basis, in the Modernization and Contracts Administration efforts (and also any other assistance deemed reasonable by both parties) for the NBHA.

The proposed agreement also provided: It is further understood and agreed upon, that the compensation for these services provided, will be at the rate of $28.50 per hour, gross, payable biweekly. NBHA will provide no other benefits to [Ruscoe], such as paid holidays, sick pay, vacation pay, or health insurance.

On January 4, 1997, Ruscoe delivered another letter to Cassella, setting forth the proposed payment schedule. On January 9, 1997, Cassella signed the January 1, 1997 agreement. From August 1997 until March 1999, other independent contractors were also hired to provide a variety of services to the Housing Authority.

The Housing Authority follows a set procedure for retaining independent contracts when their services exceed $10,000.00. This process includes advertising the position in the National Association of Housing and Urban Renewal Officials' magazine and the Hartford Courant. This procedure was followed with Ruscoe when it appeared that Ruscoe's month-to-month consultancy was going to continue. On or about July 1, 1997, the Housing Authority entered into a one-year contract with Ruscoe. The contract identified Ruscoe as "the Contractor." The contract did not restrict Ruscoe from providing services to other entities unless the other commitment created a conflict of interest. By its terms, the one-year contract ended on June 30, 1998. The Housing Authority offered Ruscoe an extension of the contract. Ruscoe never signed the contract extension, but continued to provide services to the Housing Authority.

In or about October 1997, Cassella was appointed the Housing Authority's Deputy Executive Director. In that position, Cassella supervised Donald Marzi ("Marzi"), the Building Maintenance Supervisor who was in charge of the day-to-day operations in the maintenance department.

On October 8, 1997, the Housing Authority's Board of Commissioners passed a resolution adopting a revised organizational chart. Although one of the positions included in the new organizational chart was Director of Operations/Capital Modernization & Planning, that position was not staffed until the end of 1998. In July or August 1998, the Housing Authority posted and advertised the Director of Capital Projects position. Ruscoe applied for the position. Subsequently, the Housing Authority retracted the position and made changes to it to comport with the revised organizational chart. The title became Director of Operations/Capital Modernization and Planning to comport with the revised organizational chart and the duties were expanded to include managing the maintenance division. The new position was again advertised with an application deadline of November 27, 1998. Ruscoe ap-

plied for that position by letter dated November 4, 1998.

During the time that Ruscoe provided services to the Housing Authority, Local 818 represented the supervisory personnel. Ronald Savage ("Savage") was the vice president of Local 818, and was responsible to ensure that the Housing Authority complied with the collective bargaining agreement. Ruscoe approached Savage on at least one occasion about joining Local 818 but was not able to become a member of the union.

On November 18, 1998, Ruscoe attended a Board of Commissioners' meeting to address questions and complaints about lengthy delays in improvements that the Housing Authority was experiencing in conjunction with the Commission on Community Neighborhood Development at the Security Manor, a state-operated senior citizen housing complex. Vayer claims that Ruscoe's presentation was rambling and confusing. In particular, Vayer believed that Ruscoe did not answer the residents' questions in a clear and concise manner, and that Ruscoe's presentation actually substantiated the Housing Authority's ongoing failure to address the residents' concerns in a timely fashion.

Ruscoe claims that on November 19, 1998, he had a ten-to-fifteen minute meeting with Vayer at which time Vayer expressed his disappointment with Ruscoe. Vayer claims to have no recollection of this meeting. Ruscoe asserts that during this meeting, Vayer told him that "if [he] continued to speak up on behalf of the old guard and follow the old guard, [he] would find [him]self on the outside looking in."

Vayer adamantly denies making this comment.

The interview process for Director of Operations position commenced in the fall of 1998. The interview committee consisted of Vayer, Cassella, Marzi, Mr. Bushman ("Bushman") and Mr. Salerno ("Salerno"). At that time, Vayer was fifty-two, Casella was seventy-two, Salerno was forty-nine, Marzi was fifty and Bushman was thirty-three. The committee interviewed approximately eight applicants. The three finalists for the position were Ruscoe, Carol Martin ("Martin") and Jill Steen ("Steen"). At the time of the interviews, Ruscoe was sixty, Martin was thirty-five and Steen was in her early-to-mid thirties.

Bushman's interview scoring sheets for Steen and Ruscoe contained substantial notes in the margins. His notes on the scoring sheets for Ruscoe contained comments such as "positive attitude" and "leads by example" and the words "old school." [1].

In addition, Ruscoe claims that in the summer of 1998, Bushman told him that he was "sticking with the old guard" and that he also made a similar comment about him to another Housing Authority employee. Ruscoe complained to Vayer about this comment and Vayer told him that it would not happen again.

After the first round of interviews, Steen ranked first, Martin ranked second and Ruscoe ranked third. Ultimately, it was Vayer's decision as to who would be recommended for the position. Vayer decided to schedule a second interview with each of the three finalists. Vayer drafted questions that sought to elicit information about how the finalists would deal with

1. The question to which Ruscoe's response prompted Bushman to comment "old school" was:

Assume you are named to be the Director of Operations by the Housing Authority of the City of New Britain. Describe what actions and activities you would undertake in your first 100 days in that position.

management-level issues. Vayer interviewed all three of the finalists again. At the conclusion of the interviews, he ranked Martin first, Ruscoe second and Steen third. Vayer ultimately recommended Martin for the position.

After Martin was hired, Vayer offered Ruscoe a ninety-day contract. Ruscoe declined the offer and left the Housing Authority approximately two weeks later.

### Legal Standard

The standard for deciding summary judgment motions is well established. Rule 56(c) provides that a motion for summary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See generally, Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden of showing that no factual dispute exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987).

■ The general principles underlying a motion for summary judgment fully apply to discrimination actions. *See Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."). However, the Second Circuit has cautioned that, in cases where motive, intent or state of mind are at issue, summary judgment should be used sparingly. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988).

### III. AEDA & CFEPA

■ ADEA cases are analyzed under the same familiar framework as claims brought under Title VII, 42 U.S.C. § 2000e, *et seq. See Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir.2000). That framework involves the burden-shifting analysis developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). First, a plaintiff must establish a prima facie case of age discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory business rationale for its actions. If the employer articulates such a reason, the burden shifts back to the plaintiff to prove that the employer's stated reasons are merely pretextual and that age discrimination was the true reason for the adverse employment action. *See Abdu–Brisson*, 239 F.3d at 466; *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

■ This burden-shifting analysis also applies to age discrimination claims under CFEPA. *See generally, Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 103, 671 A.2d 349 (1996).

### A. Prima Facie Case under ADEA

■ "[T]he burden that must be met by an employment discrimination plaintiff

to survive a summary judgment motion at the prima facie stage is de minim[i]s." *Chambers*, 43 F.3d at 37 (quoting *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988)) (internal quotation omitted). To satisfy the burden, the plaintiff must prove that: (1) he was a member of the protected class; (2) he applied for an available position for which he was qualified; (3) he was not appointed to the position; and (4) the action occurred under circumstances giving rise to an inference of discrimination. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir.1999).

■ Here, the parties do not dispute the fact that Ruscoe has established the first element of his prima facie case. Ruscoe was 60 years old when he interviewed for the position. Thus, he clearly falls within the protected group under the ADEA, which includes all persons over the age of 40. *See* 29 U.S.C. § 631(a). There is no dispute that Ruscoe was not hired for the position. Defendants also do not dispute that Ruscoe was qualified for the job. Therefore, the controversy here is whether plaintiff has established an inference of discrimination. This analysis may be obviated if the employer had a legitimate non-discriminatory reason for the failure to hire that the plaintiff fails to rebut. Accordingly, the court can now examine the Housing Authority's reasons for refusing to hire Ruscoe.

### B. *Defendants' Burden*

■ Assuming *arguendo* that Ruscoe has established a prima facie ADEA claim, this creates only a presumption that the employer unlawfully discriminated against the employee. *See Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. In order to rebut this presumption, the employer has the burden of producing evidence showing that there existed a legitimate, nondis-

criminatory reason for the adverse employment action. *Id.* The employer, however, "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* (citing *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978)). As the Supreme Court stated in *Burdine:*

> It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted.

*Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089.

■ Turning to Vayer's refusal to rehire Ruscoe, defendants assert that Ruscoe was not hired because he was not the best candidate for the position. They claim that Martin, the candidate that Vayer recommended, provided the best responses during the second round of interviewing and that she demonstrated more initiative than Ruscoe. Indeed, defendants claim that Ruscoe never provided examples of proactive thinking. Defendants also maintain that Martin, unlike Ruscoe, provided a long-term vision for the Housing Authority. These proffered reasons given by Vayer for defendants' decision not to hire Ruscoe are legitimate and non-discriminatory.

Thus, the burden now shifts to Ruscoe to establish the existence of a genuine factual issue as to whether defendants proffered reasons are a mere pretext, and

that unlawful discrimination was more likely than not the real reason for defendants' failure to hire him.

### C. *Pretext and Intentional Discrimination*

■ The third element in the burden-shifting analysis that comes into play if the employer has articulated a legitimate, non-discriminatory reason for the termination is whether the employer's proffered reasons are pretextual and whether there existed a discriminatory motive that was the true reason for the discharge. *See Hicks,* 509 U.S. at 517–19, 113 S.Ct. 2742. Thus, the instant motion turns on the narrow issue of whether Ruscoe has come forward with sufficient evidence to create a triable issue as to whether defendants' proffered explanations were merely pretextual and that its actual motivation was, more likely than not, discriminatory.

On this element, while not at all over-whelming, Ruscoe's evidence is sufficient to raise a factual issue as to whether the Housing Authority's proffered reason was merely a pretext for failing to hire him. The record includes comments made by Bushman and Vayer in 1998, referring to Ruscoe as "old school" and "sticking with the old guard." In addition, Ruscoe claims that Bushman's notation of "old school" on his interviewing scoring sheet occurred at the time that he was rating Ruscoe for the position and in that context, it is evidence of discrimination. Ruscoe also relies on Marzi's deposition testimony where he stated that both Bushman and Salerno made comments about Ruscoe's age while they were discussing his candidacy for the Director of Operations position. In particular, Marzi testified that both Salerno and Bushman compared Ruscoe to Marzi's father.

Accordingly, in this context, there is some ambiguity regarding the contextual interpretation of the terms "old school" and "sticking with the old guard", especially when viewed in conjunction with Marzi's testimony about comments that had been made about Ruscoe's age during the interviewing process. Where, as here, there are choices to be made between conflicting interpretations of these statements, these are matters for the jury, not for the court on summary judgment. Accordingly, the motion is denied.

### IV. *Equal Protection Claim*

In count two, Ruscoe alleges that the Housing Authority and Vayer violated his right to equal protection under the Fourteenth Amendment by not classifying him as an employee. Ruscoe claims that by failing to do so, they subjected him to selective treatment that "was based on impermissible considerations such as a malicious or bad faith intent to injure him." Compl. at ¶ 36.

■ To state a claim under the Equal Protection Clause, a plaintiff must allege that when compared with similarly situated individuals, he was selectively treated, and such selective treatment was based on impermissible considerations such as race, religion, gender, age, an intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *See Crowley v. Courville,* 76 F.3d 47, 52–53 (2d Cir.1996). The Supreme Court has also held that the equal protection clause protects individuals, even those who are a class of one, against arbitrary or invidious governmental conduct. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564–65, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

■ Here, Ruscoe claims that he was selectively treated because similarly situated persons were treated differently. Ruscoe argues that other individuals were

treated as employees, such as Cassella, who performed his duties before he was hired, and Martin, and later Axel Gonzalez (who subsequently replaced Martin) who performed the duties after Ruscoe. Ruscoe claims that he was not accorded the status of employee and, as a result, he was denied union membership and employee benefits, such as health insurance and pension. Ruscoe also contends that without union protection he was denied the opportunity to post for the Director of Operations position and obtain it almost automatically. Moreover, Ruscoe claims that he had all the attributes of an employee, such as regularly prescribed work hours, a job description, an office, computer, cell phone and support staff. These attributes, he claims, prove that he was an "employee" and was illegally classified as a contractor.

Defendants dispute that Ruscoe was similarly situated to Cassella and Martin. They argue that Ruscoe did not perform similar duties. In addition, they argue that Ruscoe was hired as an independent contractor, whereas Cassella and Martin competed for and were hired for employee positions.

There is a fundamental disagreement between the parties as to whether Ruscoe performed the same or similar job as other employees at the Housing Authority. The weighing of the evidence to determine whether Ruscoe was similarly situated is the domain of the finder of fact, not an exercise for the court on summary judgment. *See Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir.1999) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) (citations omitted)).

## V. *First Amendment Claim*

In count three, Ruscoe claims that Vayer's decision to recommend Martin for the Director of Operations position was in retaliation for Ruscoe's exercise of his free speech rights on November 18, 1998. He asserts that "[t]he defendants' and Vayer's actions intentionally violated" his First Amendment rights pursuant to 42 U.S.C. § 1983. Defendants claim that Ruscoe has not alleged, nor can he prove, that the Housing Authority's decision was retaliatory.

### A. *The Claim Against the Housing Authority*

■ As a threshold issue, the Housing Authority initially argues that Ruscoe's claims against it must be dismissed because Ruscoe has not established an official policy or custom that caused the Housing Authority to hire Martin instead of Ruscoe. *See Monell v. Dep't of Social Svcs. of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Ruscoe argues that he has established the Housing Authority's liability because the Housing Authority was a decisionmaker in the process.

In order to survive the motion for summary judgment on this claim, Ruscoe must only show that the Housing Authority was a "decisionmaker" or participated in the decision not to hire Ruscoe. *See Knight v. Connecticut Dep't of Public Health*, 275 F.3d 156, 166 (2d Cir.2001) (plaintiff must prove that the decisionmakers in her case acted with discriminatory purpose); *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (same); *see also Jeffries v. Harleston*, 21 F.3d 1238, 1247 (2d Cir.1994) ("A plaintiff may establish causation under section 1983 if he shows that the defendants participated in, or were 'moving forces' behind the deprivation") (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 819–20, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). Because there remain genuine issues of material fact as to the Housing Authority's role as a decisionmak-

er, summary judgment for the Housing Authority is improper.

### B. *First Amendment Framework*

■ In *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999), the Second Circuit set forth the analytical framework to assess a First Amendment retaliation case. Pursuant to *Morris*, a plaintiff making a First Amendment retaliation claim under § 1983 must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination. If a plaintiff establishes these three factors, the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct. *See id.* at 110.

■ Defendants do not address the first prong of this test—whether Ruscoe's November 18, 1998 statements addressed a matter of public concern. Because the question of whether certain speech enjoys a protected status under the First Amendment is one of law, not fact, the court must nevertheless engage in this inquiry. *See Connick v. Myers*, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Central to this inquiry is whether the statement may "be fairly characterized as constituting speech on a matter of public concern." *Id.* at 146, 103 S.Ct. 1684. As a general rule, speech on "any matter of political, social, or other concern to the community" is protected by the First Amendment. *Id.* Here, the speech in question criticized the Housing Authority for failing to follow HUD bidding procedures on public housing projects. This is clearly speech about matters about public concern.

■ As to the second factor, defendants argue that there was no adverse employment action. They claim that "after plaintiff allegedly exercised his free speech rights on November 18, 1998, plaintiff was one of eight applicants for the Director of Operations position to be interviewed, was then chosen as one of three finalists, and was given a second interview by Mr. Vayer." This assertion ignores the fact that Ruscoe did not get the job. In this circuit an adverse employment action includes, *inter alia*, discharge, refusal to hire, refusal to promote, demotion, reduction in pay and reprimand. *See Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir.1995) (citing *Rutan v. Republican Party*, 497 U.S. 62, 75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)). Accordingly, Ruscoe has established an adverse employment action.

■ Finally, to survive summary judgment, Ruscoe must show that the nexus between the particular speech and the adverse employment action is sufficient to warrant an inference that the protected speech was a substantial motivating factor in the adverse employment action. In other words, Ruscoe must show that the adverse employment action would not have been taken absent his protected speech. *See Mount Healthy City*, 429 U.S. at 287, 97 S.Ct. 568. The nexus causation can be established either directly by evidence of retaliatory animus or indirectly by circumstantial evidence. *See Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990). Summary judgment is precluded in cases, like this one, where there remain questions about what role the protected speech played in the adverse employment decision. *See Piesco v. City of New York*, 933 F.2d 1149, 1155 (2d Cir. 1991).

Here, it is possible, as Ruscoe alleges, that his political comments and criticism of the Housing Authority were a factor in refusing to hire him. Whether the defendants actually seized on the occasion of plaintiff's candidacy to retaliate against him for his comments at the November 18th meeting is an open question. Thus, there exists a genuine dispute about these material facts.

■ Defendants focus their argument on the last prong of the inquiry. More specifically, they claim that they would have taken the same adverse employment action even in the absence of the protected conduct.

The Second Circuit has relied on the *Pickering–Connick* test to determine whether a government employer made an adverse employment decision that would not have been made absent protected conduct or retaliatory motive. *See Gorman–Bakos v. Cornell Cooperative Extension of Schenectady County*, 252 F.3d 545, 557; *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Ed.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Under this test, if the factors set forth in *Morris* are demonstrated in plaintiff's favor, the defendants may offer evidence that the employee's protected conduct interfered with the employer's "effective and efficient fulfillment of its responsibilities to the public," *Frank v. Relin*, 1 F.3d 1317, 1329 (2d Cir.1993) (internal quotation marks omitted), to such an extent that the court can determine that the employer's interest in providing effective and efficient public services outweighs the employee's First Amendment right to free speech. *Lewis v. Cowen*, 165 F.3d 154, 162 (2d Cir.1999), *cert. denied*, 528 U.S. 823, 120 S.Ct. 70, 145 L.Ed.2d 60 (1999).

As a general rule, the application of the balancing test is a question of law that is properly performed by the district court. *Id.* at 164. In the present case, however, the facts relevant to that determination are contested and therefore it is improper for this court to decide this issue until the factual disputes are resolved by a factfinder. *See Gorman–Bakos*, 252 F.3d at 558.

In the present case, the parties disagree about whether the speech disrupted, or had the potential to disrupt, the functioning of the Housing Authority, whether such a disruption even occurred, and whether Ruscoe was not hired because of the disruption or because of the content of his speech. *See Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir.1996) ("[E]ven if the potential disruption to the office outweighs the value of the speech, the employer may fire the employee only because of the potential disruption, and not because of the speech."). These underlying factual disputes go to defendants' motivation behind Ruscoe's adverse employment action. *See Frank*, 1 F.3d at 1330 (reversing grant of summary judgment for defendants where decision to fire "clearly involved disputed questions of fact"). Under the rules of summary judgment, because essential factual issues remain unresolved, the court cannot decide as a matter of law whether defendants' interests outweigh plaintiff's interests.

### C. Qualified Immunity

■ Defendant Vayer relies on the affirmative defense of qualified immunity to argue that Ruscoe's First and Fourteenth Amendment claims against him must be dismissed. The qualified immunity doctrine "balance[s] the need to protect the rights of citizens through damage remedies, with the opposing need 'to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.' " *Danahy v. Buscaglia*, 134 F.3d 1185, 1189 (2d Cir.1998) (quoting

*Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)). As the Second Circuit observed in *Danahy,* "qualified immunity protects government officials from liability for civil damages if the challenged action 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 1190 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. The unlawfulness must be apparent." *McEvoy v. Spencer,* 124 F.3d 92, 96 (2d Cir.1997) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

■ Based on this standard, qualified immunity is not available to Vayer on the facts of this case. The right to be free from discrimination in employment on account of age is well established, both by AEDA, and, with respect to state actors, under 42 U.S.C. § 1983. The same is true with regard to the right to be free from selective treatment under the Fourteenth Amendment and the right to be free from retaliation and discrimination for the exercise of speech under the First Amendment. If discrimination or retaliation played a substantial part in the employment decision not to hire Ruscoe, Vayer's conduct could not be characterized as objectively reasonable. Accordingly, the claims against Vayer may not be resolved on the basis of qualified immunity, and Vayer's motion is denied.

For the reasons set forth above, defendants motion for summary judgment [doc. # 49] is DENIED in its entirety.